UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND and
CHARLES A. WHOBREY, as Trustee,

        Plaintiffs,

      v.

DT LEASING, LLC and SHOSHONE
TRUCKING, LLC,

        Defendants.

No. 20 C 5878

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Plaintiffs Central States, Southeast and Southwest Areas Pension Fund ("the Fund") and one of its trustees (collectively, "Plaintiffs") filed this action against DT Leasing, LLC ("DT Leasing") and Shoshone Trucking, LLC ("Shoshone") (collectively, "Defendants") to collect withdrawal liability incurred by nonparty Diamond Trucking, Inc. ("Diamond"). The parties have filed cross motions for summary judgment. R. 119, 122. For the following reasons, Plaintiffs' motion is granted in part and denied in part and Defendants' motion is denied.

### Background

The following facts are undisputed unless otherwise indicated.[1]

I.      Diamond

---

[1] "PSMF" refers to Plaintiffs' Statement of Material Facts. R. 121. "DSMF" refers to Defendants' Statement of Material Facts. R. 124. "DSAF" refers to Defendants' Statement of Additional Material Facts. R. 128.

Diamond was a dump truck company based in Peru, Indiana. PSMF ¶ 39; DSMF ¶¶ 1, 11. Around 1992, Diamond was purchased by Teresa Pendleton and her brothers, Mike, Mark, and Steve Bowyer ("Bowyer Brothers"). PSMF ¶ 2; DSMF ¶ 2. Until March 2013, Pendleton owned 52% and the Bowyer Brothers each owned 16% of Diamond. PSMF ¶ 10; DSMF ¶ 23. From 1992 until mid-2014, Diamond was bound by collective bargaining agreements ("CBAs") with certain unions ("the Union"), under which Diamond was required to make contributions to the Fund on behalf of certain of its employees. PSMF ¶ 1, DSMF ¶¶ 3, 4. While many of Diamond's competitors had white paper addenda that allowed them to perform certain types of work at lower wages and contribution rates, Diamond did not. DSMF ¶ 12. As a result, Diamond mainly hauled asphalt to road construction projects within a 30-mile radius of Peru—the only profitable work. *Id.* ¶ 11.

At some point, Pendleton and the Bowyer Brothers became aware that Diamond would incur withdrawal liability if it withdrew from the Fund. PSMF ¶ 2. Pendleton requested, and the Fund provided, estimates of Diamond's withdrawal liability five times between July 2001 and April 2014. *Id.* ¶¶ 3, 4; DSAF ¶ 4. The estimate letters stated that all trades or businesses under common control with Diamond would be jointly and severally liable for the withdrawal liability. PSMF ¶ 4.

II.     DT Leasing

In 2005, Congress passed the Graves Amendment, which prevents a vehicle owner who rents or leases the vehicle from being held liable for harm arising from

2

the vehicle's use, provided there is no negligence or criminal wrongdoing on the part of the lessor. 49 U.S.C. § 30106. Thereafter, an attorney advised Diamond that it would be prudent to set up a separate company to hold its assets and lease them back to Diamond. DSMF ¶ 14. Diamond's owners began to consider the new company as early as 2007, but because Diamond had sufficient liability insurance, restructuring was not urgently required. *Id.* ¶¶ 15, 17.

Several years later, on November 13, 2012, Pendleton and the Bowyer Brothers held a shareholders meeting, during which Pendleton stated that counsel from Scopelitis, Garvin, Light, Hanson & Feary, P.C. ("Scopelitis") had advised that a separate truck leasing company be created "for liability concerns." PSMF ¶ 8. At the end of 2012, Diamond's liabilities, other than the estimated withdrawal liability of $3.9 million, totaled approximately $300,000. *Id.* ¶ 7. At another meeting on January 18, 2013, Pendleton and the Bowyer Brothers decided that counsel would proceed with setting up a new company that would acquire Diamond's equipment and lease it back to Diamond. *Id.* ¶ 9; DSMF ¶ 21.

Shortly thereafter, on February 8, 2013, DT Leasing was formed. DSMF ¶¶ 20, 21. From that time to the present, Pendleton has owned 52% and the Bowyer Brothers have each owned 16% of DT Leasing. PSMF ¶¶ 10, 18; DSMF ¶ 23. In addition, when DT Leasing was formed, Pendleton held all officer positions of both Diamond and DT Leasing, and she remained an officer of DT Leasing until June 28, 2019. PSMF ¶ 10. As planned, in March 2013, Diamond transferred substantially all of its assets, including approximately 47 tri-axle dump trucks and other equipment, to DT

Leasing. *Id.* ¶ 14. On March 31, 2013, the Bowyer Brothers surrendered their Diamond shares, leaving Pendleton as Diamond's sole shareholder ("Share Surrender"). *Id.* ¶¶ 15, 16. From around April 1, 2013 through August 2014, DT Leasing leased all or substantially all of the transferred assets back to Diamond. *Id.* ¶¶ 19, 20.

### III. Union Negotiations and Strike

In the months leading up to August 2014, Diamond and the Union were negotiating successor agreements to the existing CBAs. PSMF ¶¶ 21, 24. The Union wanted Diamond to sign a new "Heavy Highway Agreement" ("HHA"). *Id.* ¶ 24. Diamond was willing to sign the new HHA as long as the Union also signed a white paper addendum, which Diamond believed would allow it to be more competitive in bidding for work on non-government projects. *Id.* ¶ 25; DSMF ¶¶ 37–40. As part of the negotiations, Diamond initially proposed to stop contributing to the Fund and switch to a different, less expensive fund: the Indiana Teamsters Pension Fund. PSMF ¶¶ 22, 23. When the Union rejected this request, Diamond agreed to continue participating in the Fund and negotiations continued. DSAF ¶ 9. However, Diamond continued to insist on a white paper addendum. DSMF ¶ 39. Ultimately, Diamond and the Union did not reach agreement, the Union went on strike in August 2014, and Diamond never resumed operations. PSMF ¶ 26. At the time of the strike, Diamond employed 37 drivers, most of whom went to work for other companies or left the industry. DSMF ¶ 65.

A month into the strike, on September 24, 2014, Mike Bowyer emailed Scopelitis attorney Jim Hanson, copying Pendleton, suggesting that they could, among other options, "have Shoshone sign [the HHA] to cover some of [Diamond's] work and hire who they want for drivers" or "[s]hut Diamond down, which you [Hanson] want us to get two more years for the withdraw[al] liability reason." PSMF ¶ 27. Mike Bowyer emailed Hanson again on October 27, 2014, copying Pendleton, stating in part:

> When we start down the [sic] this road we talked about if Diamond would not get something settled that it would file bankruptcy at some point in time to get out of the pension withdrawn liability and would close down. I know you would prefer to keep kicking the can down the road and to put it off as long as possible but if the end result is going to be file bankruptcy in the end why don't we just go ahead and proceed do[wn] that road now? That would get us out of the withdraw . . . .

*Id.* ¶ 28. On November 3, 2014, Hanson responded:

> The reason I would like to delay the filing of bankruptcy is to allow more time for the changes brought about with the [Diamond] reorganization to take effect. I can't guarantee that [the Fund] won't try to undo the moving of the trucks out of Diamond to the other company claiming that it was done to evade or avoid withdrawal liability. The longer the reorganization is in effect, the greater the likelihood it won't be challenged.

*Id.* ¶ 29.

IV.    Shoshone and the Hoosier Bulk Acquisition

Shoshone is a dump truck company based in Peru, Indiana that was formed on November 12, 2009. PSMF ¶ 39, DSMF ¶ 28. Originally, Ryan Barkell owned 51% of Shoshone and Rochelle Bowyer, Mike Bowyer's wife, owned the remaining 49%. PSMF ¶ 32; DSMF ¶ 29. Shoshone was a competitor to Diamond. DSMF ¶ 33. Its

5

white paper addendum allowed it to perform non-heavy highway work and pay its drivers at substantially lower rates without contributing to the Fund. *Id.* ¶¶ 31, 32. After Shoshone's HHA and white paper addendum expired on March 31, 2014, it was unable to sign a new agreement, and was thus unable to perform work it had been performing before the contracts expired. *Id.* ¶¶ 35, 36.

Shortly after the strike against Diamond began, Pendleton received a call from Linda Carpenter, the owner of another Indiana dump truck company, Hoosier Bulk, asking whether Diamond had any trucks available for lease. *Id.* ¶ 46. Pendleton replied that there were no trucks available because of the strike, and when she joked that Carpenter should buy Diamond, Carpenter responded that Pendleton should buy Hoosier Bulk. *Id.* ¶ 48. Pendleton later followed up to confirm Carpenter's offer was a serious one and asked for a copy of Hoosier Bulk's CBA. PSMF ¶ 35. At her deposition, Pendleton testified that Hoosier Bulk's CBA "was a much better contract than what we had been trying to negotiate with the union."[2] *Id.* Thereafter, Pendleton decided to buy Hoosier Bulk, and her lawyer advised that it would be less expensive for Shoshone to acquire Hoosier Bulk than for Pendleton to start a new company to acquire Hoosier Bulk. *Id.* ¶ 51.

Barkell agreed to sell, and on December 10, 2014, Pendleton acquired his 51% interest in Shoshone and became its president. *Id.* ¶¶ 30–32; DSMF ¶ 52. The next month, Shoshone acquired Hoosier Bulk, and the companies merged in March. PSMF

---

[2] Shoshone denies that this was the reason for the Shoshone and Hoosier Bulk transactions.

6

¶ 34; DSMF ¶ 54. The transaction was structured as a stock sale and merger to allow Shoshone to succeed Hoosier Bulk's HHA and white paper addendum. DSMF ¶¶ 56, 57. The agreement required Hoosier Bulk (and then Shoshone) to contribute to the Indiana Teamsters Pension Fund. PSMF ¶ 35. With this transaction structure, the Union considered Shoshone to be the successor to Hoosier Bulk and honored the HHA and white paper addendum. DSMF ¶ 55.

Following the transaction, Shoshone worked on Hoosier Bulk's Southern Indiana contract, delivering wet batch concrete to the I-69 construction project, for which it purchased nine dump trucks from Hoosier Bulk. DSMF ¶¶ 56, 57. Shoshone did not complete any of Diamond's open or unfinished projects. *Id.* ¶ 75. Since that time, Shoshone has engaged in trucking and hauling asphalt, stone, sand, dirt and other aggregates for road and bridge construction jobs. PSMF ¶ 40. Shoshone has provided those services to Diamond's former customers along with other customers due to its broader geographic reach. *Id.* ¶ 41; DSMF ¶ 62. Shoshone has leased Diamond's former assets from DT Leasing and used many of the same vehicles and equipment that Diamond had used in its operations. PSMF ¶ 37; DSMF ¶ 73. Shoshone did not occupy the same office space as Diamond, DSMF ¶ 76, but between January 2015 and December 2017, it parked vehicles and equipment at Diamond's former principal office address. PSMF ¶ 38.[3]

---

[3] Defendants deny this fact based on deposition testimony from Pendleton. DSMF ¶ 77. However, in answering the complaint, both DT Leasing and Shoshone admitted this allegation and did not attempt to withdraw that admission through amendment. R. 41 ¶ 112; R. 55 ¶ 112. That admission is binding. *See Crest Hill Land Dev., LLC,*

In March 2015, Shoshone's three employees included Pendleton, as president; Rochelle Bowyers, who performed accounting and bookkeeping functions; and Ted Peters, as a dispatcher. PSMF ¶¶ 42, 44; DSMF ¶¶ 68, 69. All three employees performed substantially the same functions at Diamond until December 2014. PSMF ¶¶ 32, 42, 44; DSMF ¶ 71.[4] Of the 38 drivers Shoshone employed in 2015, 11 had previously driven for Diamond at least seven months prior. DSMF ¶ 67.

V.    Withdrawal Liability Assessment, Arbitration, and Lawsuit

Around May 26, 2015, Diamond, through Pendleton, received a notice and demand for payment of withdrawal liability issued by the Fund in accordance with 29 U.S.C. §§ 1382(2) and 1399(b)(1) dated May 22, 2015 ("Notice and Demand"). PSMF ¶ 45. The Notice and Demand demanded the full payment of the entire amount of withdrawal liability ($4,649,785.19) by June 1, 2015. *Id.* On August 21, 2015, Diamond requested a review of the withdrawal liability pursuant to 29 U.S.C. § 1399(b)(2)(A) through counsel, copying Pendleton. *Id.* ¶ 48. On February 16, 2016, Diamond initiated arbitration pursuant to 29 U.S.C. § 1401(a) to challenge the withdrawal liability. *Id.* ¶ 49. DT Leasing did not request a review of the withdrawal liability assessment or initiate arbitration in relation to the assessment. *Id.* ¶ 50.

---

*v. City of Joliet*, 396 F.3d 801, 805 (7th Cir. 2005) (concession in answer is binding judicial admission that "has the effect of withdrawing the question" from dispute for purposes of summary judgment).

[4] Defendants deny that these individuals "have performed substantially the same duties as they previously performed for Diamond (although Teresa Pendleton retired in March 2019). R. 29 ¶ 44. But that statement is supported by Plaintiffs' citations to the record. R. 55 ¶¶ 100–03; R. 121-7. It is not refuted by the facts cited by Defendants in its response. *See* R. 124 ¶¶ 68–71.

On March 24, 2016, the Fund filed a lawsuit against Diamond to collect the withdrawal liability. *Id.* ¶ 52; *see also Central States, Southeast and Southwest Areas Pension Fund v. Diamond Trucking, Inc.*, Case No. 16-cv-03555 (N.D. Ill.). A few days later, Hanson notified Mike Bowyer and Pendleton about the suit and stated, "The only thing [the Fund] doesn't know is that Diamond doesn't have any money." PSMF ¶ 53. Mike Bowyer replied, in part, "Is it time for Diamond to file Bankruptcy? Instead of messing around with it[.]" *Id.* Months later, on December 14, 2016, while the arbitration and lawsuit were pending, Diamond filed a petition for Chapter 7 bankruptcy, and the withdrawal liability suit was stayed. *Id.* ¶¶ 54, 55; *see also In re Diamond Trucking, Inc.*, Case No. 16-32627 (Bank. N.D. Ind.).

The bankruptcy trustee did not pursue Diamond's challenges to withdrawal liability, and the arbitration was subsequently dismissed on February 21, 2017. PSMF ¶ 56. In December 2018, the trustee initiated an adversary proceeding against DT Leasing, Shoshone, Pendleton, the Bowyer Brothers, and Rochelle Bowyer. DSMF ¶ 85. Ten months later, the parties entered into an Amended Stipulation to Settle, in which the trustee released and discharged the adversary defendants from:

> any and all claims, demands, causes or rights-of-action that the Trustee has against the Releasees or any property of Releasees, whether arising from or in any way connected or related to the claims asserted in the Adversary Proceeding or the Bankruptcy Case whether merged or set forth in the litigation or not . . . known or unknown, it being the intention of the parties that no claim, demand, cause or right-of action between the parties, including but not limited to claims of successor liability, shall survive this Agreement except as set forth herein.

*Id.* ¶ 88. After the bankruptcy court approved Amended Stipulation to Settle, the Fund objected and moved for reconsideration based on its concern that the release

could be interpreted as including its successor liability claim. *Id.* ¶ 89; R. 124-22. The court amended its order, providing "that the trustee's release covers only those claims held by the trustee that are property of bankruptcy estate of Diamond . . . The court's approval . . . makes no determination concerning claims that are individual and particular to [the Fund] that are not property of the bankruptcy estate." DSMF ¶ 91.

Plaintiffs claim they are owed \$4,649,785.19 as the principal balance, \$3,129,821.50 in interest, \$3,129,821.50 in liquidated damages, and post-judgment interest. PSMF ¶¶ 58–62. Defendants admit the amounts but dispute their liability.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not

return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Discussion

I.   DT Leasing

A.  Legal Framework

Under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA"), an employer who withdraws from a multiemployer pension fund is liable for withdrawal liability in an amount roughly equal to its proportionate share of the plan's unfunded vested benefits. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 217 (1986); 29 U.S.C. §§ 1381, 1391. Withdrawal liability applies not only to the withdrawing employer but to all other "trades or businesses" that are under "common control" with that employer. 29 U.S.C. § 1301(b)(1); *Loc. 705 Int'l Bhd. of Teamsters Pension Fund v. Pitello*, 3 F.4th 949 (7th Cir. 2021) (citing 29 U.S.C. § 1301(b)(1)). Relatedly, any transaction entered into that has a principal purpose of evading or avoiding withdrawal liability is disregarded for purposes of collecting withdrawal liability. 29 U.S.C. § 1392(c).

To collect withdrawal liability, a plan must determine the amount of withdrawal liability owed by the employer and send the employer a notice and demand for payment. 29 U.S.C. §§ 1382, 1391, 1399(b)(1); *Cent. States, Se. & Sw. Areas Pension Fund v. Bell Transit Co.*, 22 F.3d 706, 707 (7th Cir. 1994). If the employer wants to contest the assessment, it must first ask the plan for a review within 90 days. 29 U.S.C. §§ 1399(b)(2)(A); *Bell Transit*, 22 F.3d at 707. Any dispute

11

over withdrawal liability must be resolved through arbitration. 29 U.S.C. § 1401(a)(1); *Trs. of Suburban Teamsters of N. Ill. Pension Fund v. E Co.*, 914 F.3d 1037, 1039 (7th Cir. 2019).

Critically, "an employer's failure to arbitrate means the plan can then immediately file suit to collect the entire amount of withdrawal liability, and in that proceeding the employer will have forfeited any defenses it could have presented to the arbitrator." *E Co.*, 914 F.3d at 1039 (citations and internal quotation marks omitted); *see also Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 848 (7th Cir. 2015) ("*ManWeb I*") (describing how this "harsh" result "effectuates Congress's intent to ensure the stability of pension funds"). There is a "narrow exception to this general rule of forfeiture" where a party "had absolutely no reason to believe that they might be deemed members of a controlled group but is nonetheless sued and alleged to be liable for another party's withdrawal liability based on ERISA's controlled group provision." *E Co.*, 914 F.3d at 1039 (citing *Central States, Southeast and Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371–72 (7th Cir. 1992)). Moreover, the statutory duty to arbitrate is not triggered until an employer receives a proper notice and demand. *Chicago Truck Drivers v. El Paso Co.*, 525 F.3d 591, 597 (7th Cir. 2008); *see also* 29 U.S.C. § 1399(b)(1) (a notice and demand must be sent to "the employer" and must include the amount of liability, a schedule of payments, and a demand for payment").

B. Application

Thus, to prevail on a collection claim, Plaintiffs must show that (1) the Fund is a multiemployer pension plan and DT Leasing was an "employer" for the purposes of ERISA; (2) the Fund notified DT Leasing of its assessed liability; and (3) DT Leasing failed to timely initiate arbitration. *El Paso*, 525 F.3d at 597 (citation omitted). Here, Plaintiffs argue that all three requirements are met, while DT Leasing maintains that it was never an "employer" and never received notice.

### i. Employer

As to the first element, there is no dispute that the Fund is a multiemployer pension plan. But while Plaintiffs contend that DT Leasing was an "employer" on the date of withdrawal because the Share Surrender had a principal purpose of evading or avoiding withdrawal liability, DT Leasing insists that it was never an "employer," i.e., a "trade or business" under common control with Diamond. The issue of whether a company *remains* an employer is arbitrable, but the issue of whether a company was ever an employer is a threshold question for the Court. *Banner Indus. v. Cent. States Se. & Sw. Areas Pension Fund*, 875 F.2d 1285, 1293 (7th Cir. 1989) (citing *Flying Tiger Line v. Teamsters Pension Trust Fund of Phila.,* 830 F.2d 1241, 1247 (3d Cir. 1987)). DT Leasing asserts that although it was under common control with Diamond between February 8, 2013 and March 30, 2013, it was not a "trade or business" until after the Share Surrender on April 1, 2013.

Yet, DT Leasing admitted that it was a "trade or business" within the meaning of 29 U.S.C. § 1301(b)(1) between February 8, 2013 and March 30, 2013 in response to Plaintiffs' requests for admission. R. 121-18 ¶ 2. Responses to requests for

13

admission are judicial admissions. A matter admitted in response to a request for admission is deemed "conclusively established" unless the Court, on motion, allows the admission to be withdrawn or amended. *See* Fed. R. Civ. P. 36(b); *see also United Fire & Cas. Co. v. Prate Roofing & Installations, LLC*, 7 F.4th 573, 584 (7th Cir. 2021) (citing cases). DT Leasing never moved to withdraw or amend its admission, so the admission remains binding. *Murrey v. United States*, 73 F.3d 1448, 1455 (7th Cir. 1996) ("If the answer . . . to a request for admissions admits liability, the defendant cannot then deny liability on the ground that there is evidence that the admission was mistaken."). There is thus no genuine dispute of material fact that DT Leasing was an employer at some point before withdrawal.

To be sure, DT Leasing disputes the Share Surrender was designed to evade or avoid withdrawal liability. But that is a "defense [that] needs to be raised in arbitration." *El Paso*, 525 F.3d at 598 n.1 (citing *Banner*, 875 F.2d at 1288) (the fact that defendants "were once MPPAA employers" was sufficient to satisfy first element of collection claim where the fund alleged that the defendants' removal from common control was designed to evade or avoid withdrawal liability); *see also* 29 U.S.C. § 1401(a)(1) ("Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration."); *Flying Tiger Line v. Teamsters Pension Trust Fund of Phila.,* 830 F.2d 1241, 1247 (3d Cir. 1987) ("We conclude that where the party against which withdrawal liability is being asserted was certainly part of the controlled group of an employer subject to MPPAA at some

14

point in time, and where the issues in dispute fall within the purview of MPPAA provisions that are explicitly designated for arbitration, the Act's dispute resolution procedures must be followed."); *Banner*, 875 F.2d at 1293 (adopting the holding of *Flying Tiger*). Accordingly, because there is no genuine dispute that DT Leasing was once an MPPAA employer, Plaintiffs have satisfied the first element of the collection claim.

ii.     Notice

As to the second element, it is undisputed that Pendleton—who was an officer and owner of both Diamond and DT Leasing—received a Notice and Demand on May 26, 2015, which included the amount of liability and a demand for immediate payment. DT Leasing argues that this does not constitute actual notice because the Notice and Demand was not addressed to and did not mention DT Leasing. Instead, the Notice and Demand referenced liability against Diamond and "all members of any controlled group of trades or businesses" of which Diamond was a member, and at that time, DT Leasing was no longer part of the controlled group. DT Leasing also argues that while notice to one member of a controlled group is notice to all, constructive notice does not apply to former controlled group members.

*El Paso* is instructive. In that case, after trucking company ANR Advance underwent bankruptcy proceedings, a pension fund sued former members of its controlled group to collect withdrawal liability. 525 F.3d at 597. Because the defendants "were once MPPAA employers," the case hinged on the adequacy of the fund's notice and demand. *Id.* at 598. Specifically, the fund had filed a proof of claim

15

for withdrawal liability in the bankruptcy, which the defendants' counsel discovered two years later. *Id.* at 597. The Court rejected the fund's argument that the defendants had constructive notice before their counsel's discovery by virtue of their prior membership in the controlled group and the "evade or avoid" provision. *Id.* at 599–600. However, the Court held that the defendants had actual notice as of the date of their counsel's discovery, even though the notice was not sent to the defendants (it merely "fell into the right hands") and did not contain any signal that it could operate against the defendants. *Id.* at 601 (citing *Slotky*, 956 F.2d at 1375). Likewise here, although DT Leasing did not have constructive notice by virtue of its prior membership in a controlled group with Diamond, it had actual notice of the Notice and Demand through its owner and officer, Pendleton.[5]

Further, this is not a situation where a party "had absolutely no reason to believe" that it might be deemed to be a member of the controlled group. *E Co.*, 914 F.3d at 1039. To the contrary, approximately six months before Pendleton received the Notice and Demand, counsel Hanson advised Pendleton and Mike Bowyer to delay Diamond's filing for bankruptcy, noting there was no guarantee that the Fund wouldn't "try to undo the moving of the trucks out of Diamond to the other company

---

[5] DT Leasing argues that *El Paso* is distinguishable because DT Leasing's counsel did not receive the Notice and Demand. The record indicates that Hanson, who testified that DT Leasing was a client of his firm and is representing DT Leasing in this litigation, was aware of the Notice and Demand as of August 21, 2015. *See* R. 124-4 at 9:7-9 (testifying that DT Leasing was a client of the firm); R. 128-10 (letter from Hanson to the Fund noting that the Fund issued the Notice and Demand and requesting review). It is not clear from the record, however, when Hanson began representing DT Leasing. Regardless, Pendleton's actual notice is more direct than defense counsel's notice in *El Paso*.

16

claiming that it was done to evade or avoid withdrawal liability," but that "the longer the reorganization is in effect, the greater the likelihood it won't be challenged." PSMF ¶ 29. Thus, DT Leasing does not have a "credible claim of surprise." *Id.*; *see also Slotky*, 956 F.2d at 1373 ("Anyone who suspects that he might be adjudged a member of a controlled group and therefore subject to withdrawal liability would be well advised to commence arbitration, so that if a court holds that he is a member of such a group and hence subject to such liability he won't have waived the issues that are reserved for arbitration.").

The Court thus finds that DT Leasing received a proper notice and demand, which triggered its statutory duty to arbitrate. By not initiating arbitration, DT Leasing waived its right to assert non-liability. Therefore, DT Leasing is jointly and severally liable for the withdrawal liability. On that basis, the Court grants summary judgment to Plaintiffs on the claim against DT Leasing without reaching the merits of the parties' "evade or avoid" arguments.

II.    Shoshone

The parties raise a number of arguments in support of their respective motions for summary judgment on the successor and alter ego liability claims against Shoshone. The Court begins with the parties' dispute about whether these claims were released in the bankruptcy settlement.

A.    Settlement Release

As detailed in the background section, the bankruptcy court held that "the trustee's release covers only those claims held by the trustee that are property of

bankruptcy estate of Diamond" and that the settlement approval made "no determination concerning claims that are individual and particular to [the Fund] that are not property of the bankruptcy estate." DSMF ¶ 91. Thus, the question is whether the successor and alter ego liability claims asserted by Plaintiffs were held by the trustee as property of Diamond's bankruptcy estate.

A bankruptcy trustee's task is to recover and manage "property of the estate," which the Bankruptcy Code defines as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541. To that end, the trustee is the only party who can bring actions on behalf of the estate under 11 U.S.C. § 323 or on behalf of the creditors as a class under 11 U.S.C. § 544. *In re Teknek, LLC*, 563 F.3d 639, 646 (7th Cir. 2009); *see also Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1343 (7th Cir. 1987) ("Pursuant to 11 U.S.C. § 544 the trustee, in his capacity as a creditor, may bring suit to reach property or choses in action belonging to the estate that will then be distributed to all creditors."). "The trustee's single effort eliminates the many wasteful and competitive suits of individual creditors" and "protect[s] the creditors from one another." *Koch*, 831 F.2d at 1342–43 (citations omitted).

A trustee's "right to bring a claim depends on whether the action vests in the trustee as an assignee for the benefit of creditors or, on the other hand, accrues to *specific* creditors." *Id.* at 1349 (internal quotation marks and citations omitted) (emphasis in original). In other words, a trustee may bring claims that could be asserted by any creditor of the corporation ("general claims"), but not those in which

"the claimant himself is harmed and no other claimant or creditor has an interest in the cause [of action]" ("personal claims"). *Id.* at 1348–49 ("The equally valid mirror-image principle is that a single creditor may not maintain an action on his own behalf against a corporation's fiduciaries if that creditor shares in an injury common to all creditors and has personally been injured only in an indirect manner."). "To determine whether an action accrues individually to a claimant or generally to the corporation, a court must look to the injury for which relief is sought and consider whether it is peculiar and personal to the claimant or general and common to the corporation and creditors." *Id.* at 1349.

Shoshone, for its part, emphasizes *Koch*'s definition of a personal claim as one where "the claimant himself is harmed and no other claimant or creditor has an interest in the cause [of action]." *Id.* at 1348. Shoshone contends that the "cause" is successor and alter ego liability, and because any creditor could have sought unpaid monies on a successor or alter ego liability theory, the Fund's effort to recover the unpaid withdrawal liability through such causes of action is a general claim. Plaintiffs, on the other hand, highlight *Koch*'s instruction to "look to the injury for which relief is sought" and "consider whether it is peculiar and personal to the claimant or general and common to the corporation and creditors." *Id.* at 1349. In Plaintiffs' view, what matters is whether the injury is unique to the Fund, not the legal theory used to seek redress for the injury against a non-debtor. Because no other

19

creditor suffered the injury of withdrawal liability, a claim seeking withdrawal liability is personal, regardless of the legal theory asserted.[6]

*Teknek* is instructive. In *Teknek*, Systems Division Inc. ("SDI") initiated a patent infringement action against competitor Teknek LLC ("Teknek") and its affiliate Teknek Electronics ("Electronics"). 563 F.3d at 641. After winning, SDI successfully moved the court to add to the judgment as defendants on alter ego and successor theories Teknek's shareholders and a new entity to which Teknek and Electronics had fraudulently transferred assets. *Id.* Meanwhile, Teknek filed for bankruptcy, and the trustee filed an adversary proceeding contending that the shareholders were alter egos of Teknek. *Id.* at 641–42. The Seventh Circuit considered whether SDI's alter ego claims belonged to the trustee. *Id.* The Court explained:

> [T]he fact that the underlying harm suffered by SDI was patent infringement does not, by itself, make it a claim no other creditor could assert. By such logic, all creditors' claims would be personal to the specific creditor: a supplier's claim for payment on supplies would be deemed personal because no other creditor could claim payment for the same supplies; an employee's claim for his back pay would be personal to the extent that no other employee could claim back pay for that

---

[6] Plaintiffs also reference an email exchange between the bankruptcy trustee and Plaintiffs' counsel, where the trustee opines on what claims he could release and intended to release. R. 130-1 (trustee stating, "I do not think I can release anything more than the causes of action I have asserted as trustee in the adversary proceeding. I think, as a matter of law, that that is all I can do and could not do more even if I wanted to (which I do not)."). Shoshone argues that this email is hearsay, which a "party may not rely on . . . to avoid summary judgment." *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011). Whether or not it is hearsay, this email—articulating the position of the trustee—has no bearing on whether the release covers the claim at issue because it preceded the bankruptcy court's amended order approving the Amended Stipulation to Settle. The amended order is what guides this Court's analysis.

> employee's hours worked. If all such claims were "personal," no creditor would have to wait in line behind the bankruptcy trustee to assert her claims. With such segregation of claims, the bankruptcy system would collapse.

*Id.* at 644. What made the difference was that SDI had proven that Electronics inflicted an independent injury against it, and that the alter egos inflicted an independent injury against Electronics—without regard to the debtor. *Id.* at 649.

Thus, the focus of the inquiry is not merely on the nature of the injury but rather on how that injury relates to the debtor. If the injury to the creditor is derivative of the injury to the debtor, it is general. *See, e.g.*, *Koch*, 831 F.3d at 1349 (oil companies' alter ego claim against member owners for misusing corporate form was general because the injury to the oil companies flowed from injury to debtor corporation). If the injury is to the creditor directly, independent of any injury to the debtor, it is personal. *See, e.g.*, *Teknek*, 563 F.3d at 649 ("SDI's claim against the alter egos does not depend on the alter egos' misconduct with respect to the debtor."). Here, the Fund's alter ego and successor liability claims are focused on redressing an injury specific to them: withdrawal liability. That injury is not common to all creditors, and it was not inflicted on Diamond. Instead, it was inflicted directly on the Fund by Diamond's withdrawal without payment. Thus, the claims were not property of the bankruptcy estate and were not released in the settlement.

Two other Seventh Circuit cases support this conclusion. In *Steinberg v. Buczynski,* 40 F.3d 890, 891–92 (7th Cir. 1994), the Court considered whether a bankruptcy trustee could bring a veil piercing claim against a debtor corporation's shareholders to collect on a judgment for unpaid pension contributions owed by the

21

corporation. The trustee alleged that the shareholders disregarded corporate formalities, but did not allege that they "looted" or otherwise injured the corporation. *Id.* Instead, the only injured party was the pension fund. *Id.* at 892. By virtue of piercing the corporate veil, the shareholders stood in the shoes of the corporation as debtors to the fund, and the fund could sue them directly to redress that injury. *Id.* at 892–93. The trustee could not. *Id.* at 893. As the Court explained, "there is a difference between a creditor's interest in the claims of the corporation against a third party, which are enforced by the trustee, and the creditor's own direct—not derivative—claim against the third party, which only the creditor himself can enforce." *Id.* at 893.

Similarly, *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 451–54 (7th Cir. 1991) involved a settlement between former employees, a predecessor employer, and successor employers in connection with various creditors' claims for debts and the employees' claims for unpaid pension benefits. After the settlement, the employees sued the successor employers' corporate parent for the unrecovered pension benefits on an alter ego theory of liability. *Id.* The defendant argued that the plaintiffs' claims were barred by the settlement agreement's release of "any and all claims" that could have been asserted in the bankruptcy proceeding. *Id.* at 463. In considering whether the claims were general or personal under *Koch*, the Court emphasized that the plaintiffs were the only creditors in the bankruptcy proceeding to assert claims for lost pension benefits. *Id.* The Court concluded that because the alter ego claims "were not claims of the creditors generally but ERISA claims unique to the former

employees," they were personal, and could not have been asserted in the bankruptcy proceeding. *Id.*

Shoshone contends that *Lumpkin* and *Steinberg* do not undermine its position for several reasons. As to *Lumpkin*, Shoshone argues that a veil piercing[7] claim for unpaid pension benefits is significantly different from Plaintiffs' successor liability claim, which, it says, was available to all creditors and could have been pursued by the trustee. But Shoshone focuses on the doctrine rather than the injury. Because Plaintiffs invoke the successor liability theory to redress unique and direct harm, as in *Lumpkin* and *Steinberg*, the claim was not property of the estate. Shoshone also emphasizes the brevity of the Seventh Circuit's discussion of whether the claim was general or personal, and claims that other facts affected the Court's analysis. But none of the facts Shoshone identifies (namely that the defendant was not named in the settlement agreement and that the successor employers were formed to shield the defendant) appear in the relevant discussion. Rather, the Seventh Circuit's analysis turned on whether the injury was specific to the employees or general to the creditor class.

As to *Steinberg*, the Court agrees with Shoshone that *Steinberg*'s analysis and holding are consistent with the Seventh Circuit authority that precedes and follows it. But the Court disagrees with Shoshone's interpretation of those cases and how

---

[7] To the extent that Shoshone suggests that the *Lumpkin* plaintiffs did not bring alter ego claims, Shoshone is mistaken. *See, e.g.*, *Lumpkin*, 944 F.2d at 463 ("[The] plaintiffs' *alter ego* claims against Envirodyne could not have been asserted in the bankruptcy proceeding because they were not claims of the creditors generally but ERISA claims unique to the former employees.") (emphasis added).

they apply to this case. Further, Shoshone contends that under *Steinberg*'s analysis, a successor liability claim inherently asserts that Shoshone's continued operations caused harm to Diamond. But Shoshone does not explain how or why that is the case. *Steinberg* does not suggest that a claim aimed at imposing successor liability necessarily involves harm to the debtor corporation, nor does Shoshone cite any other authority in support of this proposition.

Lastly, Shoshone notes that while the trustee in *Steinberg* did not bring a claim on behalf of the estate, the bankruptcy trustee's adversary complaint against Shoshone shares "the same core allegations underlying a successor liability claim." R. 143 at 3. The trustee brought a single fraudulent conveyance claim against Shoshone based on its possession of trucks transferred to DT Leasing, along with its use of Diamond's former drivers, clients, customer lists and goodwill. *See* R. 124-18. But the fact that there are overlapping factual allegations between that claim and Plaintiffs' successor liability claim does not render the latter claim property of Diamond's estate. The focus is on the injury the claim seeks to address, and here, the injury sought is not derivative of any injury to Diamond.

Shoshone also points to *In re Pierport Dev. & Realty, Inc.*, 502 B.R. 819 (Bankr. N.D. Ill. 2013). There, the bankruptcy court considered whether to enjoin the union from pursuing an alter ego claim against a debtor corporation's owners, which sought to hold the owners liable for the debtor's obligations under an arbitration award against the debtor. *Id.* at 825–30. The court held that because the allegations supporting the alter ego claim showed an injury to the debtor, the claim could be

pursued only by the trustee. *Id.* at 829. But it is not clear how the allegations cited by the court, which described the shared operations of the debtor and the owners, showed an injury to the debtor. *Cf. Steinberg*, 40 F.3d at 891–92 (veil-piercing claim was personal where defendants disregarded corporate formalities but did not loot or otherwise injure the corporation). Thus, *Pierport* is unpersuasive.

Shoshone lastly relies on several other cases from outside this Circuit. *See In re Emoral, Inc.*, 740 F.3d 875, 881–82 (3rd Cir. 2014) (personal injury claims against a debtor's third-party affiliate on a successor liability theory were general); *Labarbera v. United Crane & Rigging Servs., Inc.*, No. 08-cv-3274, 2011 WL 1303146, at *12 (E.D.N.Y. Mar. 2, 2011) (trustees and fiduciaries of pension fund's alter ego and successor liability claims for unpaid contributions were general); *In re Cabrini Medical Ctr.*, 489 B.R. 7, 22–23 (S.D.N.Y. 2012) (creditors' alter ego claims against the debtor were property of the estate and released by settlement); *Maney v. Fischer*, No. 96-cv-561, 1998 WL 151023, at *2 (S.D.N.Y. Mar. 31, 1998) (trustees of pension fund's alter ego claims for unpaid contributions were general because they were premised on an injury to the debtor). In this Court's view, Seventh Circuit precedent, as applied to the facts at hand, requires a different outcome here.

### B.  Alter Ego and Successor Liability

Having determined that Plaintiffs' alter ego and successor liability claims were not released in the bankruptcy settlement, the next question is whether summary judgment is due on those claims. "Both successor and alter-ego liability incorporate a *scienter* component coupled with an analysis of similarities between the old and new

entities." *McCleskey v. CWG Plastering, LLC*, 897 F.3d 899, 903 (7th Cir. 2018). Successor liability requires "notice of the obligation by the new entity," *id.*, and "substantial continuity in the operation of the business," including "ownership, physical assets, intangible assets, management and workforce, business services, and customers," *Indiana Elec. Workers Pension Benefit Fund v. ManWeb Servs., Inc.*, 884 F.3d 770, 777, 778 (7th Cir. 2018). Alter ego liability requires a "fraudulent intent to avoid collective bargaining obligations" and that the entities generally share "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *McCleskey*, 897 F.3d at 903; *see also Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp.*, 85 F.3d 1282, 1287 (7th Cir. 1996) ("The factors a court should consider are 1) the amount of respect given to the separate identity of the corporation by its shareholders; 2) the fraudulent intent of the incorporators; and 3) the degree of injustice visited on the litigants by respecting the corporate entity."). Both analyses are "fact-intensive," but "boil down to a simple question: despite the two entities' legal separation, does the evidence suggest they are one and the same?" *McCleskey*, 897 F.3d at 903.

Beginning with scienter, it is undisputed that when Pendleton purchased a majority stake in Shoshone and acquired Hoosier Bulk, she had notice of Diamond's potential withdrawal liability. Shoshone contends that there was insufficient notice because there was no asset transfer from Diamond to Shoshone, and thus no opportunity for Shoshone to protect itself through an indemnification clause or a lower purchase price. Shoshone relies on *ManWeb I*, wherein the Seventh Circuit

26

noted that "it would be inequitable to impose successor liability on an innocent purchaser when the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price." 794 F.3d at 847 (citation omitted). But *ManWeb I* did not hold that the notice required for successor liability only arises where there is an asset transfer. Indeed, the Seventh Circuit has found otherwise. *See McCleskey*, 897 F.3d at 903–05 (reversing district court's determination that defendant was not a successor where there was no acquisition and the owner of the alleged successor was aware of the magistrate judge's recommendation of judgment against the predecessor). Pendleton's knowledge of Diamond's potential withdrawal liability when she purchased a majority stake in Shoshone and acquired Hoosier Bulk is sufficient to satisfy the notice requirement for successor liability.

However, as to fraudulent intent, reasonable jurors could disagree about whether Shoshone was used to avoid collective bargaining obligations. On the one hand, during negotiations with the Union, Diamond proposed ceasing contributions to the Fund and switching to the less expensive Indiana Teamsters Pension Fund, which the Union rejected. A month into the strike, Mike Bowyer told Hanson and Pendleton that they could "have Shoshone sign the [HHA] to cover some of [Diamond's] work and hire who they want for drivers." PSMF ¶ 27. Shortly thereafter, Pendleton arranged for Shoshone to acquire Hoosier Bulk, which had an HHA and white paper addendum that required contributions to the Indiana Teamsters Pension Fund and was, in Pendleton's view, a better contract than the CBA being negotiated

with the Union. A reasonable juror could view these facts as reflecting an intent to avoid Diamond's collective bargaining obligations.

On the other hand, after the Union rejected Diamond's request to switch funds, Diamond agreed to drop that request and continued negotiating with the Union. It was not until months after the strike began that the opportunity to acquire Hoosier Bulk arose serendipitously. Pendleton's attorney advised that it would be more economical for Shoshone to acquire Hoosier Bulk rather than creating a new entity to complete the acquisition. Neither Shoshone nor Hoosier Bulk were brand new companies created by Pendleton or the Bowyer Brothers, but instead existing market participants. And Pendleton's attorney was aware that Shoshone's own union contract had expired and it was unable to perform work. A reasonable juror considering these facts could find that Shoshone was not a vehicle for Diamond to avoid collective bargaining obligations but rather a way for Pendleton to acquire Hoosier Bulk and make money in the absence of income from Diamond.

As to whether there was "substantial continuity in the business" or "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership," Diamond and Shoshone bear a number of similarities in the relevant features. But there are differences too.

*Business Purpose, Operations, and Customers.* Both entities were dump truck companies based in Peru, Indiana. Although they never occupied the same office space, between 2015 and 2017, Shoshone parked vehicles and equipment at Diamond's former office. Both companies conducted trucking and hauling activities,

28

including trucking and hauling asphalt, stone, sand, dirt, and other aggregates for road and bridge construction jobs in Indiana. However, Diamond mainly hauled asphalt within a 30-mile radius of Peru, while Shoshone operated across the state. Shoshone serviced the same customers that Diamond had before the strike, but Shoshone did not complete any of Diamond's open or unfinished projects and had other customers due to its broader geographic reach, though the record does not reveal how many.

*Assets and Equipment.* Diamond did not transfer any assets or equipment to Shoshone after it stopped operating. Rather, Shoshone purchased nine trucks from Hoosier Bulk to work on the existing Hoosier Bulk project following the acquisition. Yet, when Shoshone needed more trucks to operate in the spring of 2015, it leased trucks and equipment from DT Leasing, many of which Diamond had previously used in its operations and had transferred to DT Leasing, though here again the record does not reflect how many or the denominators on either side. The fact that Shoshone did not acquire Diamond's assets does not render alter ego or successor liability inapplicable as a matter of law. *See McCleskey*, 897 F.3d at 904–05 (reversing district court's determination that defendant was not a successor or alter ego where predecessor transferred assets to a third party, which leased them to alleged successor); *Teamsters Loc. Union No. 727 Health & Welfare Fund v. De La Torre Funeral Home & Cremation Servs., Inc.*, No. 19 C 6082, 2023 WL 4664918, at *7–8 (N.D. Ill. July 20, 2023) (finding sufficient continuity to support successor liability even though there was no asset transfer).

*Ownership, Management, and Workforce.* Pendleton was a controlling owner of both entities, but she was Diamond's sole owner, while Rochelle Bowyer owned 49% of Shoshone. Relatedly, at the time of the Hoosier Bulk acquisition, Shoshone employed three individuals (Pendleton, Rochelle Bowyer, and Peters), all of whom had worked at Diamond in the same or similar functions before the strike. Before the strike, Diamond employed 37 drivers. After the strike began, most went to work for other companies or left the industry. Of the 38 drivers that Shoshone employed in 2015, less than one third (11) had previously worked for Diamond, and each of them had at least a seven-month gap in work for the two entities.

Ultimately, this cross-cutting evidence is for the factfinder to weigh, not the Court on summary judgment. Considered as a whole, these facts would allow reasonable factfinders to find that Diamond and post-acquisition Shoshone were "one and the same," or not. *See McCleskey*, 897 F.3d at 903–05 (reversing district court's grant of summary judgment to defendant on alter ego and successor liability claims based on differences between two entities where there was some evidence of overlapping ownership, equipment use, employees, and customers). Therefore, summary judgment is denied as to both parties on the alter ego and successor liability claims.

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part Plaintiffs' motion for summary judgment [119] and denies Defendants' motion for summary judgment [122]. The Court grants summary judgment to Plaintiffs on the

claim against DT Leasing and denies summary judgment to both parties on the alter ego and successor liability claims.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: August 29, 2025